**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| Aredien Corp, Super Fish Seafood Corp, Now Plastics, Inc., Coast Supplies LLC, Y-6, LLC, Delta-Q Technologies Corp, Dwyer Marble & Stone Supply, Ammex Corporation, Midwest Italian Import Company, LLC., and ITALUSA, Inc., and Sixpenny, Inc.<br>　　　　　Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Acting Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative;* OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, *in* his *official capacity as Secretary of the Department of Homeland Security,*<br>　　　　　Defendants. | Case No.　26-03036<br><br><br>**Complaint** |

1

**COMPLAINT**

1.      President Donald Trump has imposed a 10% import tax/tariff on most imports into the United States. This tariff was imposed without regard to the express requirements and limitations imposed by Congress and the language of the statute purportedly authorizing such tariffs.

2.      This is not this Court's first experience with new and extraordinary tariffs imposed by President Trump. Last year, a three-judge panel of this Court found that the President's claimed authority to impose unilateral and unlimited tariffs at his personal discretion exceeded any possible authority under the International Emergency Economic Powers Act (IEEPA)—and the Supreme Court ultimately agreed, striking down the President's IEEPA tariff regime. *Learning Res., Inc. v. Trump*, Nos. 24-1287, 25-250, 607 U.S. ___ (2026).

3.      In express response to the Supreme Court ruling limiting his tariff power— indeed, on the same day the Supreme Court issued its decision—the President reimposed his global tariffs citing as legal authority Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132. Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation").

4.      While Section 122, unlike IEEPA, does grant the President some power to impose tariffs, it does so under specific circumstances that do not currently exist, and imposes specific limitations on the President's authority which he has declined to observe.

5.      Tariffs are only authorized under Section 122 to address international balance-of-payments problems—a problem which does not currently exist, and which problem may, in fact, be impossible under the system of floating exchange rates.

6. Furthermore Section 122 requires uniform treatment—the President cannot generally make exemptions on a policy basis. This provision of law is not followed as the Section 122 Proclamation provides for many exemptions, in express violation of the terms of Section 122.

7. As with the IEEPA tariffs, this Court should find that the President's Section 122 tariffs exceed the tariff authority granted to him by Congress, and enjoin their operation, reaffirming once again what the Supreme Court made clear a few weeks ago: the imposition of tariffs is a power of Congress and can be exercised by the President only for the purposes it has granted to him, subject to those limitations Congress imposed.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction under 28 U.S.C. § 1581, because this action is commenced against an officer of the United States and arises out of a law of the United States providing for tariffs. 28 U.S.C. § 1581(i)(1)(B).

9. The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

## PARTIES

10.     Plaintiff Aredien Corp ("Aredien") is a business headquartered in New York. Aredien imports perfumes and cosmetic packaging components from China. Aredien is therefore an interested party pursuant to 28 U.S.C § 2631(i).

11.     Plaintiff Super Fish Seafood Corp ("Super Fish") is a Florida-based business. Super Fish imports fresh fish from Ecuador, Costa Rica, Panama, Trinidad, Suriname, and Guatemala and places significant emphasis on the quality and freshness of its produce. Super Fish is therefore an interested party pursuant to 28 U.S.C § 2631(i).

12.     Plaintiffs Now Plastics, Inc. ("Now Plastics") and Everfresh Packaging Inc. ("Everfresh") are Massachusetts-based businesses. Now Plastics and Everfresh import plastic film and bags as well as aluminum foil from India, China, Indonesia, Thailand, Taiwan, Korea, and Europe. Therefore, Now Plastics and Everfresh are interested parties pursuant to 28 U.S.C § 2631(i).

13.     Plaintiff Coast Supplies LLC is a Delaware-based business that imports vinyl flooring, engineered wood flooring, plastic tile clips, and flooring underlayment from China, Thailand, Vietnam, and Cambodia. Coast Supplies LLC is therefore an interested party pursuant to 28 U.S.C § 2631(i).

14.     Plaintiff Y-6, LLC is a Florida-based business importing clothing from Pakistan and India. Y-6, LLC is therefore an interested party pursuant to 28 U.S.C § 2631(i).

15.     Plaintiff Delta-Q Technologies Corp ("Delta-Q") is a business headquartered in Burnaby, British Columbia, Canada. Delta-Q imports industrial battery chargers and their accessories from China, India, and Indonesia. Delta-Q is therefore an interested party pursuant to 28 U.S.C § 2631(i).

16.     Plaintiff Dwyer Marble & Stone Supply Inc. ("Dwyer Marble") is a Michigan-based business. Dwyer Marble imported natural stone slabs and tile, engineered slabs and tile from Brazil, Spain, Italy, India, Indonesia, the Philippines, Thailand, and Vietnam. Dwyer Marble is therefore an interested party pursuant to 28 U.S.C § 2631(i).

17.     Plaintiff Ammex Corporation ("Ammex") is a Washington-based business. Ammex has imported disposable gloves and other safety ancillary products from China, Malaysia, Indonesia, Thailand, Vietnam, and India. Plaintiff Ammex is therefore an interested party pursuant to 28 U.S.C § 2631(i).

18.     Plaintiff Midwest Italian Import Company, LLC., and ITALUSA, Inc. (collectively, "Midwest Italian") are Illinois-based businesses. Midwest Italian imports pasta, olive oil, tomatoes, tomato preparation sauce, vinegar, egg pasta, pesto, dipping sauces, frozen pizza, chocolate products, jarred condiments, roasted peppers, shelf-stable cake products, and passata from Italy and Peru. Plaintiff Midwest Italian & ITALUSA are therefore an interested parties pursuant to 28 U.S.C § 2631(i).

19.     Plaintiff Sixpenny, Inc. ("Sixpenny") is a New York-based business. It imported furniture and home goods from China, Malaysia, India, and Vietnam. Plaintiff Sixpenny is therefore an interested party pursuant to 28 U.S.C § 2631(i).

20.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

21.     Defendant Executive Office of the President is the federal agency that oversees core functions of the executive branch, including the Office of the United States Trade Representative.

22.    Defendant United States of America is the federal government of the United States of America.

23.    Defendant United States Customs and Border Protection is a federal agency, and a component of the Department of Homeland Security, responsible for, *inter alia*, securing ports of entry and collecting tariffs on imported goods. It is headquartered in Washington, D.C.

24.    Defendant Rodney S. Scott is the Commissioner of United States Customs and Border Protection. He is sued in his official capacity.

25.    Defendant Jamieson Greer is the United States Trade Representative and is sued in his official capacity.

26.    Defendant Office of the United States Trade Representative is the federal agency responsible for developing United States trade policy. It is headquartered in Washington, D.C.

27.    Defendant Department of Homeland Security is the federal agency of which Customs and Border Protection is a subagency.

28.    Defendant Markwayne Mullin is the United States Secretary of Homeland Security and is sued in his official capacity.

## FACTS

29.    The Constitution vests all "legislative Powers" to Congress, beginning with the foundational "Power To lay and collect Taxes" and "Duties." U.S. Const. art. I, § 8, cl. 1. The President possesses no inherent or independent authority to impose tariffs, and may only do so when exercising specific, limited powers delegated by Congress under strictly defined conditions.

**The Executive Actions**

30.     On April 2, 2025, "Liberation Day," the President issued Executive Order 14257, Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025) (the "Liberation Day Order"),[1] which imposed sweeping new tariffs at rates not seen since the Great Depression—including a global 10% tariff on nearly every country in the world, regardless of whether they impose tariffs on United States products, the rates at which they do so, or the existence of any trade agreements governing the relationship.

31.     In addition to the global 10% tariff, the Liberation Day Order levied much higher tariff rates on dozens of countries based on what the administration claimed to be an estimate of "tariff and nontariff barriers." Such estimate ultimately turned out to be a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country. Such methodology was not an accepted methodology for calculating the impact of trade barriers.

32.     As a statutory basis, the Liberation Day Order, and the subsequent orders modifying that tariff regime, cited the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"); the National Emergencies Act, 50 U.S.C. § 1601 et seq.; Section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483; and 3 U.S.C. § 301.

---

[1] 90 FR 15041 (April 7, 2025) ("Executive Order 14257"), Federal Register :: Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits.

33.    On February 20, 2026, the United States Supreme Court held that the Liberation Day tariffs were ultra vires, because IEEPA does not grant the President tariff authority. *Learning Res., Inc. v. Trump*, Nos. 24-1287, 25-250, 607 U.S. ___ (2026). "The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope," the Supreme Court explained. "In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it." Slip op. at 20.

34.    The same day as the Supreme Court action, the President, in a press conference and in posts on social media, objected to the Supreme Court's decision, and announced that in response he would be issuing new replacement tariffs under other statutory authorities, including Section 122 of the Trade Act of 1974. 19 U.S.C. § 2132.

35.    Later that day, the President issued Proclamation 11012, Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems, (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation").[2]

36.    The Section 122 Proclamation asserts that "the United States faces fundamental international payments problems, such as large and serious balance-of-payments deficits, an imminent and significant depreciation of its currency in foreign exchange markets, or an international balance-of-payments disequilibrium."

37.    The Section 122 Proclamation further states that "senior officials have informed me that fundamental international payments problems within the meaning of section 122 exist and that special import measures to restrict imports are required to address these problems."

---

[2] Federal Register :: Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems.

38.    According to the Section 122 Proclamation, "the United States runs a deficit in selling goods and services overseas, as reported by the United States Bureau of Economic Analysis (BEA) in the 'balance on goods and services'; has recently reflected quarterly deficits in its return on investment or labor, as reported by the BEA in the 'balance on primary income'; and runs a deficit in voluntary transfers, such as remittances, as reported by the BEA in the 'balance on secondary income.'"

39.    "In other words," according to the Section 122 Proclamation, "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country."

40.    The Section 122 Proclamation therefore "find[s] that fundamental international payments problems within the meaning of section 122 exist; that those problems significantly harm United States national interests, including economic and national security interests; and that special measures to restrict imports are required to address those problems, as authorized by section 122."

41.    The President imposed, based on claimed authority in Section 122, a surcharge of 10% on goods imported into the United States—the same amount as the global reciprocal tariff imposed under the original Liberation Day order— subject to various exemptions and carve outs, for a period of 150 days.  This 150-day period is the maximum duration allowed by Section 122 without congressional approval.

42.    The Section 122 Proclamation includes two Annexes, detailing which categories of imports the new tariffs apply to, as well as a variety of exempted products. Exemptions include aircraft components, citrus juice, automobile components, semiconductors, and

Acai.[3] There are also exemptions for various countries—including Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua.

43.    The following day, the President, via a social media post,[4] announced that he was increasing the new global Section 122 tariffs to 15%, the maximum allowed by the statute.[5] The legal requirements for increasing the 15% have never been completed and the original 10% continues to control.

44.    The 10 percent tariffs went into effect on February 24, 2026.[6]

**Section 122**

45.    Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, is titled "Balance-of-payments authority," and permits the President to impose "temporary import surcharges and temporary limitations on imports through quotas in situations of fundamental international payments problems." 19 U.S.C. § 2132(a).

46.    Section 122 permits the President to impose tariffs for 150 days under specific circumstances, to address specific problems: either (1) " large and serious United States balance-of-payments deficits;" (2) "an imminent and significant depreciation of the dollar in foreign exchange markets;" or (3) "[cooperation] with other countries in correcting an international balance-of payments disequilibrium." *Id.*

---

[3] Annex II lists 76 pages of products exempt from the tariffs imposed by the Section 122 Proclamation.
[4] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 21, 2026, at 9:59 a.m. ET), https://truthsocial.com/@realDonaldTrump/posts/116109447886304328.
[5] At the time of filing, it is unclear when or whether the 15% tariffs will go into effect.
[6] U.S Customs and Border Protection, CSMS # 67844987 – Imposing Temporary Section 122 Duties (Feb. 23, 2026) (available at CSMS # 67844987 - Imposing Temporary Section 122 Duties).

47.    The Section 122 Proclamation claims the United States has a balance-of-payments issue, in the form of large and persistent trade deficits—the first category. The President has not made assertions relevant to the second and third categories.

48.    When such "fundamental international payments problems require special import measures," Section 122 permits the President to proclaim for up to 150 days "a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States . . . ." *Id.*

49.    This import surcharge must be imposed on a nondiscriminatory basis across different countries—that is, the 15% tariff "shall be applied consistently with the principle of nondiscriminatory treatment." 19 U.S.C. § 2132(d).

50.    The Trade Act of 1974 defines the term "nondiscriminatory treatment" as "trade treatment based on normal trade relations (known under international law as most-favored-nation treatment)." 19 U.S.C. § 2481(9).

51.    Section 122 provides an exception to the nondiscrimination provision, but it is limited, providing that if "the President determines that the purposes of this section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action." 19 U.S.C. § 2132(d)(2).

52.    Section 122 additionally requires that "[i]mport restricting actions proclaimed pursuant to subsection (a) shall be of broad and uniform application with respect to product coverage . . .." 19 U.S.C. § 2132(e). That is, Section 122 requires equal treatment not just among different countries but also among types of imports.

11

53.    There is a limited exception to this as well, "where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy." *Id.*

54.    However, "[s]uch exceptions shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." *Id.*

55.    "In addition, uniform exceptions may be made where import restricting actions will be unnecessary or ineffective in carrying out the purposes of this section, such as with respect to articles already subject to import restrictions, goods in transit, or goods under binding contract." *Id.*

56.    But "[n]either the authorization of import restricting actions nor the determination of exceptions with respect to product coverage shall be made for the purpose of protecting individual domestic industries from import competition." *Id.*

57.    Section 122 therefore permits the President to impose tariffs of up to 15%, for a period of up to 150 days, subject to explicit limitations: it must be to remedy a balance-of-payments deficit and must be generally uniform across countries and categories of goods. The Section 122 Proclamation does not adhere to these limitations.

58.    The United States is not experiencing a balance-of-payments deficit. Indeed, it is impossible for the United States to experience the sort of balance-of-payments deficits envisioned by Section 122 under current economic conditions.

59.    The Section 122 Proclamation treats the existence of bilateral trade deficits in goods as a balance-of-payments deficit, but these are distinct economic phenomena.

60.     At the time Congress was considering the Trade Act of 1974, it was believed that the United States would adhere to a fixed exchange rate monetary system, like it had under Bretton Woods.

61.     Under the Bretton Woods system, other countries around the world could convert their currency into dollars at fixed exchange rates, and dollars could in turn be converted into gold bullion. This created a potential problem: if prevailing conditions make conversion into gold appealing, the United States government ran the risk of too many dollars being converted, depleting U.S. gold reserves to meet its commitments. *See Recent Changes in Monetary Policy and Balance-of-Payments Problems: Hearings Before the H. Comm. on Banking & Currency*, 88th Cong., 2d Sess. 235 (1964).

62.     This state of affairs occurred in the early 1970s. Faced with dwindling gold reserves, and a large and persistent deficit in the balance of payments, President Richard Nixon came up with the "Nixon shock," suspending the conversion of dollars into gold and imposing, among other policies, temporary tariffs to mitigate the effects of that crisis. Proclamation No. 4074, 85 Stat. 926 (1971).

63.     The Nixon tariffs were controversial, and it was unclear whether President Nixon had the authority to impose them. They were invalidated by the predecessor of this Court, but ultimately the predecessor of the Federal Circuit held that President Nixon had the authority to impose the tariffs at issue under the Trading with the Enemy Act of 1917. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

64.     By the time of the *Yoshida* decision, Congress had already acted, passing the Trade Act of 1974, including Section 122, with the specific purpose of granting authority for

the type of action Nixon had taken—subject to specific rules laid down by Congress to cabin presidential discretion.

65.    And the court in *Yoshida* stated that any tariffs imposed in response to balance-of-payments problems after the enactment of Section 122, including any imposed in response to the balance-of-payments emergency declared by President Nixon, "must, of course comply" with Section 122. 526 F.2d at 582 n.33.

66.    But, until now, no president has ever used Section 122 to impose balance-of payments tariffs. That is because the conditions it contemplates—a balance-of-payments deficit akin to that Nixon faced in the early 1970s—has not occurred since before Section 122 was passed.

67.    In 1976, the United States entered the Jamaica Accords, which formally ended the Bretton Woods monetary system. Since then, the United States has operated in a floating rate exchange system. Because the exchange rate automatically adjusts, balance-of-payments deficits are no longer economically possible after the end of Bretton Woods.

68.    The simple fact is that "a system of floating exchange rates completely eliminates the balance-of-payments problem—just as in a free market there cannot be a surplus or a shortage in the sense of eager sellers unable to find buyers or eager buyers unable to find sellers. The price may fluctuate but there cannot be a deficit or a surplus threatening an exchange crisis." Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967).

69.    As the 1963 report from the Joint Economic Committee explained, "[t]he [balance-of-payments] deficit under the official U.S. definition, measures the reduction in U.S. . . . monetary reserve assets (chiefly gold) and the increase in liquid liabilities. Stated

14

another way, it measures the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities." Joint Econ. Comm., 88th Cong., *The United States Balance of Payments-Perspectives and Policies* 3 (Comm. Print Nov. 12, 1963).

70.     The balance-of-payments deficit is different from the trade deficit—rather, the U.S. trade deficit in goods is a subset of the overall balance of payments calculation.

71.     The Section 122 Proclamation notes only those aspects of the United States balance-of-payments calculation that are currently negative—while ignoring those positive aspects that counterbalance the claimed deficits.

72.     There are three elements of the balance of payments: the current account, the capital account, and the financial account. *See* U.S. Bureau of Economic Analysis, Balance of Payments (Apr. 11, 2018).[7]

73.     The deficits claimed in the Section 122 Proclamation are current account deficits. Indeed, the primary deficit identified—the balance of trade—is itself only one subset of the current account calculation. The current account consists of transactions between U.S. residents and nonresidents in goods, services, primary income, and secondary income. U.S. Bureau of Econ. Analysis, *U.S. International Transactions Release—Additional Information*, https://www.bea.gov/news/trans release-additional-information (last visited May 20, 2026) (describing the components of the current account).

74.     Congress was aware of this distinction, which is why Section 122 itself distinguishes between "balance-of-payments" and "balance-of-trade." Section 122 grants the President specific authority to reduce tariffs to deal with "large and persistent United States

---

[7] https://www.bea.gov/help/glossary/balance-payments

balance-of-trade surpluses" (emphasis added)—yet the Section 122 Proclamation claims the inverse power to raise tariffs to confront trade deficits. *See* 19 U.S.C. § 2132(c). Section 122 does not grant the president that power.

75.    The Section 122 Proclamation ignores the effect of the financial and capital accounts—which represent inflows that counterbalance the current account deficits the President identifies. The President is claiming the balance is off by looking at only one side of the scale.

76.    When these mitigating elements are added to the calculation, the claimed balance of payments problem disappears. The current U.S. balance-of-payments discrepancy of approximately $53 billion represents only 0.2 percent of GDP—which is relatively insignificant in the United States' multi-trillion-dollar economy, undermining the President's characterization of the discrepancy being "large and serious" as required by Section 122. *See U.S. Bureau of Econ. Analysis, U.S. International Transactions Release—Additional Information,* U.S. International Transactions Release—Additional Information | U.S. Bureau of Economic Analysis (BEA) (last visited May 20, 2026) (defining "statistical discrepancy").

77.    On appeal, the Solicitor General agreed with the appellees that Section 122 does not apply where the US economy's only deficit arises from trade rather than a much broader balance-of-payment deficit and disruption : "Nor does [Section 122] have any obvious application here, where the concerns the President identified in declaring an emergency arise from trade deficits, which are conceptually distinct from balance of-payments deficits." Reply Br. for Appellants, *V.O.S. Selections, Inc. v. Trump, Federal Cir.* No. 25-1812, at 13. The Senate report on Section 122—which the President cited in his brief—explains the possibility that large trade deficits could in fact exist with a balance-of-payments surplus. S.

Rep. No. 93-1298, at 89 (1974) (recognizing the possibility of "a large payments surplus" at the same time as "a large trade deficit").

78.    The President made this admission in more than one federal court: "the President's actions here [under IEEPA] do not identify or focus on balance-of payments concerns of the type addressed by Section 122. Instead, the concerns the President identified in declaring an emergency arise from trade deficits, which are conceptually distinct from balance-of-payments deficits." Reply Br. of Appellants, *Learning Resources, Inc. v. Trump,* D.C. Cir. No. 25-5202, at 19 (also citing S. Rep. No. 93-1298, at 89).

79.    When the Supreme Court held that the President lacked authority under IEEPA to impose tariffs, the President responded by deploying a statute the President admitted was not applicable given the present state of the U.S. economy.

80.    Indeed, four judges of the Federal Circuit—who dissented from that court's holding that IEEPA did not authorize the President's Liberation Day tariffs—agree that the "particular problems recited in [the Liberation Day order] to establish the statutorily required unusual-and-extraordinary threat are not focused on a 'monetary crisis,' . . . that gave rise to Congress's enactment of section 122." *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1360 (Fed. Cir. 2025) (Taranto, J., dissenting) (joined by Moore, C.J., Prost, J., and Chen, J.) (citing S. Rep. No. 93-1298, at 87–89 (1974); H. R. Rep. No. 93-571, at 27–31 (1973)). Rather, the President's actions are "focused on deficiencies in 'domestic production' (including deficiencies in 'the U.S. manufacturing and defense-industrial base' and to the nation's making of agricultural products) wholly or partly caused by the purchase of imported goods made abroad in place of domestically made goods." *Id.* at 1360–61.

17

81.    Thus, Section 122 does not give the President the power to impose tariffs to address the trade deficit, which he admitted -- and the Federal Circuit confirmed -- is conceptually distinct from "balance-of payments" issues in the U.S. economy.

82.    Moreover, the current construction of Section 122 is not uniform, as required under the Trade Act of 1974. The Section 122 Proclamation's exceptions are not narrow and are not limited to those categories allowed by Section 122—instead, they are arbitrary and seemingly indicative of political policy preferences. Section 122 does not give the President discretion to apply Section 122 with such variation.

83.    While the Proclamation claims that certain goods must be exempted "because of the needs of the United States economy," no part of the Proclamation or the Annexes demonstrate that the exempted goods are "limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." 19 U.S.C. § 2132(e).  It is not enough for the President to claim such items are unavailable domestically, without providing any evidence of this alleged supply shortage.

84.     Therefore, the Proclamation's exemptions are also not a lawful application of Section 122.

85.    On May 7, 2026, this Court issued a decision holding that the Trump Administration's 10% global tariffs imposed under Section 122 were unlawful. *See Burlap and Barrel, Inc., et al., v. United States*, et al., No. 26-01472-3JP, Slip-Op 26-47. On May 12, 2026, the U.S. Court of Appeals for the Federal Circuit temporarily stayed that ruling. *Burlap and Barrel, Inc. v. Trump*, 26-1805, (Fed. Cir.).

86.    Plaintiffs respectfully request relief from the Section 122 tariffs on the basis that this Court has reviewed the law outlined herein and determined that such tariffs are unlawful.

**The Harm to Plaintiffs**

87.    Each of the plaintiffs to this suit have suffered severe pecuniary harm directly caused by the illegally imposed Section 122 tariffs.

88.    The imports of plaintiffs are subject to Section 122 tariffs. These tariffs have forced plaintiffs to pause spending on innovation, halting new product development and new partnerships. Additionally, the unlawfully imposed tariffs have caused the importers to lose profits, higher shipping costs, cash flow issues, inventory fluctuations due to supply chain uncertainty, and lost customers due to inventory shortages. These impacts will continue while the Section 122 tariffs remain in effect. Given the structure of the importers' revenue model, these entities cannot immediately raise prices to offset tariff costs. Thus, the tariffs have significantly reduced the company's profits. As a result of these losses, plaintiffs have been forced to freeze hiring, reduce bonuses to its US employees, and limit new investments back into its businesses.

89.    The impact on Plaintiffs, as well as countless other American businesses, of the President's unilateral, worldwide tariffs initially, and unlawfully, imposed using IEEPA, and now, also unlawfully, under Section 122, is severe and will continue to harm Plaintiffs with unnecessary, illegal additional costs.

### COUNT ONE

**The President's Section 122 tariffs exceed his statutory authority.**

90.    The preceding paragraphs 1 to 89 are incorporated herein by reference.

19

91.     The Section 122 Proclamation imposes a 10% tax on goods imported from anywhere in the world (except where he has decided to make an extra-statutory exemption). This is estimated to cost some $35 billion over the 150 days of initial relief. Comm. for a Responsible Fed. Budget, *How Much Will Trump's New 10% (or 15%) Tariffs Raise?*, (Mar. 4, 2026).[8] If President Trump increases the rate to 15%, the cost rises to $50 billion. *Id.*

92.     This impact is at least as large—and likely much larger—than executive actions previously found by the Supreme Court to be "major questions," requiring a clear statement by Congress to authorize executive discretion. *See*, e.g., *Biden v. Nebraska*, 600 U.S. 477 (2023) (approximately $430 billion in student loan forgiveness); *West Virginia v. EPA*, 597 U.S. 697 (2022) (EPA authority to regulate carbon emissions where the administration had not offered a specific emission reduction plan); *NFIB v. OSHA*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

93.     Presidential authority to unilaterally impose worldwide tariffs must be granted clearly and unmistakably—not through ambiguous "balance-of-payments" language inappropriately interpreted and applied. *See NFIB*, 595 U.S. at 125 (Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) ("Congress does not usually 'hide elephants in mouseholes.'").

94.     Section 122 allows the President to impose special import measures, including tariffs, when fundamental international payment problems exist, for three reasons: (1) "to deal with large and serious United States balance-of-payments deficits;" (2) "to prevent an

---

[8] https://www.crfb.org/blogs/how-much-will-trumps-new-10-or-15-tariffs-raise.

imminent and significant depreciation of the dollar in foreign exchange markets;" or (3) "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." *See* 19 U.S.C. § 2132(a).

95.    The Section 122 Proclamation does not identify any significant depreciation of the dollar in foreign exchange markets or to cooperate with other countries in correcting an international balance-of-payments disequilibrium. Instead, it simply asserts that the tariffs are justified to deal with large and serious United States balance-of-payments deficits.

96.    No large and serious balance-of-payments deficit exists in the United States. Indeed, our current economic framework makes it impossible for such a deficit to exist.

97.    No president, until now, has attempted to use Section 122 to impose tariffs to combat trade deficits, even though the United States has carried a trade deficit every year since 1976.

98.    The existence of trade deficits in goods with some other countries does not qualify as a balance-of-payments deficit, as required by Section 122.

99.    The existence of trade deficits in goods with some other countries is not a fundamental international payments problem, as required by Section 122.

100.    Courts are generally skeptical of newly claimed grants of authority discovered for the first time in decades old statutes. *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

21

101.   Indeed, Congress passed Section 122 to limit the Presidents discretion, allowing the policy approach President Nixon took only under specific circumstances and with specific limitations, all of which the Proclamation declines to observe.

102.   Congress knows how to grant the President authority to impose or adjust tariffs to address issues with the balance of trade—19 U.S.C. § 2132(c) expressly provides authority to the President to impose tariffs when there is a surplus in the balance of trade, but it does not authorize the President to impose tariffs to deal with balance of trade deficits.

103.   The President's interpretation of Section 122 is not entitled to deference—rather; it is the duty of the courts to independently "determine the best reading" of the statute at issue. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

104.   Section 122 does not grant the President power to impose tariffs under these circumstances—it does not mention such a power or imply it. The President's actions exceed the statutory authority Congress granted him.

105.   The assertion that Section 122 grants the President his claimed authority raises a major question that requires Congress to speak clearly in granting such a broad and consequential power to upend the global economy.

106.   "In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [President] the unprecedented power over American industry that would result from the Government's view." I*ndus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980). If anything qualifies as a "decision . . . of vast economic and political significance," requiring a clear statement under the major question doctrine, this is it. *West Virginia*, 597 U.S. at 716.

107.    Moreover, the exemptions and exceptions the President has made are in direct violation of the text of Section 122, which requires generally uniform treatment.

108.    The tariffs illegally imposed by the President via Section 122 directly and irreparably harm Plaintiffs, who will face increased costs for the goods they sell, less demand for their higher-priced products, and disrupted supply chains, among other threats to their livelihood.

## COURT TWO

**The President's interpretation of Section 122 violates the nondelegation doctrine.**

109.    The preceding paragraphs 1 to 89 are incorporated herein by reference.

110.    Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1.

111.    The nondelegation doctrine is, in the first instance, an attempt to take this provision seriously: there are legislative powers to make laws, and "all" such power resides in the Congress. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it.").

112.    Implicit in this set-up is the premise that neither branch may delegate its sphere of power to any other. "The Vesting Clauses, and indeed the entire structure of the Constitution, make no sense [if there is no limit on delegations]." Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002).

113. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

114. The Court therefore requires that any grant of regulatory authority be provided with an "intelligible principle" that will form the basis of agency action. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935).

115. The basic requirement that derives from the Supreme Court's cases is that "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)).

116. If Section 122 did grant the President the broad, standardless discretion he claims, allowing him to redefine the term "balance-of-payments deficit" to mean a trade deficit—which it does not—and has done so clearly enough to satisfy the major questions doctrine—which it has not—it would be an unlawful delegation of legislative authority without any intelligible governing principle.

117. If there are any constitutional limits to delegation at all, they apply here, in a case where the executive claims authority to impose massive tax increases and start a worldwide trade war. This, like the IEEPA tariffs before it, is the most "sweeping delegation of legislative power" claimed by the executive since the Supreme Court invalidated the National Recovery Act in 1935. *Schechter Poultry*, 295 U.S. at 539; *see Id.* at 542 (noting that the NRA gave the "virtually unfettered'' discretion to the president "in approving or prescribing

24

codes, and thus enacting laws for the government of trade and industry throughout the country").

118.    This interpretation would render Section 122 the equivalent of the delegations the Supreme Court previously struck down, "one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. at 474.

119.    This interpretation of Section 122 would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. I*ndus. Union Dep't*, 448 U.S. at 646 (citing *A. L. A. Schechter Poultry Corp. V. United States*, 295 U.S. 495, 539 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

120.    If the President can treat a period without a balance-of-payments deficit as a crisis for political convenience, the same could be said of virtually any international economic transaction he disapproves of. The President would have the power to impose any level of tariffs on goods or services from any country or for any purpose.

121.    The President's interpretation of Section 122 provides no intelligible principle limiting the imposition of tariffs.

122.    The Section 122 Proclamation unlawfully imposes tariffs that directly and irreparably harm Plaintiffs, who will face increased costs for the goods they sell, less demand for their higher-priced products, and disrupted supply chains, among other threats to their livelihood.

**PRAYER FOR RELIEF**

25

WHEREFORE, Plaintiffs seek damages and equitable relief in connection with Defendants' improper conduct, and specifically pray that the Court grant the following relief to Plaintiffs by:

a. Declare that Section 122 does not grant the President the statutory authority to unilaterally impose the challenged tariffs;

b. Declare that the President has not identified a valid balance-of-payments deficit as required by Section 122 and that the continued existence of trade deficits in goods is not itself a balance-of-payments deficit;

c. Declare that, if Congress had granted the President the unilateral authority to impose tariffs provided by the Section 122 Proclamation, it is an unconstitutional delegation of legislative power;

d. Enjoin the operation of the Section 122 Proclamation;

e. Award Plaintiffs damages in the amount of any tariffs collected by Defendants pursuant to the challenged orders;

f. Award Plaintiffs other such damages as are appropriate;

g. Award Plaintiffs their attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable law; and

h. Grant any such other relief as this Court may deem just or proper.

i. Order immediate refunds to the plaintiff-importers notwithstanding the liquidation status of the parties' entries or the location of the parties' individual banking accounts

registered with U.S. Customs through any electronic data interchange system, and irrespective of the applicability of anti-dumping or countervailing duties on said entries.

Respectfully submitted,

/s/ David Craven
David Craven
Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
773 709-8506

/s/ Jennifer Diaz
Jennifer Diaz
Diaz Trade Law PLLC
12700 Biscayne Boulevard, Suite 401
North Miami, FL 33181
Tel. 305-456-3830
Jen@diaztradelaw.com

*Counsel for Plaintiffs*

Dated: June 3, 2026